# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

TIMOTHY MOON,

                Plaintiff,                Case Number:  04-CV-71882

v.                                     JUDGE PAUL D. BORMAN
                                         UNITED STATES DISTRICT COURT

HARRISON PIPING SUPPLY, a MI
corporation; MICHIGAN TOOLING
ASSOCIATION WORKERS
COMPENSATION FUND, a MI corporation;    *AMENDED OPINION*
MICHIGAN TOOLING ASSOCIATION    *May 17, 2005*
SERVICE COMPANY, a MI corporation; and
DR. ASIT RAY,

                Defendants.

_____ /

## AMENDED OPINION AND ORDER GRANTING DEFENDANTS' MOTIONS TO DISMISS PLAINTIFF'S COMPLAINT UNDER RULE 12(b)(6)[1]

Now before the Court are Defendants' motions to dismiss Plaintiff's complaint under

Federal Rule of Civil Procedure 12(b)(6) or, in the alternative, to stay proceedings.  The Court

heard oral argument on February 7, 2005.  Having considered the entire record, and for the

reasons that follow, the Court:

    1)      DISMISSES Plaintiff's claims under the Racketeer Influenced and Corrupt
             Organizations Act, 18 U.S.C. § 1961, *et seq.*, because they fail to state claims for
             which relief may be granted, and because Michigan's Workers' Disability
             Compensation Act, M.C.L.A 418.131, *et seq.*, reverse-preempts those claims

---

[1]The opinion is amended solely with regard to the discussion of "detrimental reliance" in the
context of the RICO claims, beginning on page 24.

under the McCarran-Ferguson Act, 15 U.S.C. § 1012(b); and

2)      DISMISSES Plaintiff's state-law claims of intentional infliction of emotional
        distress against Defendants for failure to state claims for which relief may be
        granted.

## I. FACTS

At all times relevant to the instant action, Timothy Moon ("Plaintiff") was an employee of Harrison Piping Supply ("Harrison").  (1st Am. Compl. at ¶ 4.)  The Michigan Tooling Association Workers Compensation Fund ("the Fund") and the Michigan Tooling Association Service Company ("the Service") insured Harrison for workers-compensation claims and adjusted such claims for Harrison, respectively.  (*Id.*)  Dr. Asit Ray ("Ray") examined Plaintiff, on behalf of the other Defendants, concerning his entitlement to workers compensation benefits. (*Id.* at ¶ 9 (f))

On June 7, 2004, Plaintiff filed a First Amended Complaint against Harrison, the Fund, the Service, and Ray (collectively "Defendants"), alleging that each Defendant engaged in a fraudulent enterprise to deny Plaintiff of his workers' compensation benefits in violation of the Racketeer Influenced and Corrupt Organizations Act ("the RICO Act"), 18 U.S.C. § 1961, *et seq.*, and alleging that the corporate Defendants intentionally inflicted emotional distress upon Plaintiff in violation of Michigan law.  (*Id.* at ¶¶ 7-19.)

On July 20, 2004, Harrison filed the instant motion to dismiss Plaintiff's complaint under Federal Rule of Civil Procedure 12(b)(6) or to stay proceedings.  The stay relates to the fact that Plaintiff has an on-going workers' compensation claim proceeding.  The Service, the Fund, and Ray concur in this motion to the extent that Harrison's arguments would equally apply to Plaintiff's claims against them.  (Ray Mot. at 2.)  On August 13, 2004, Ray filed the instant

2

motion to dismiss Plaintiff's complaint under Federal Rule of Civil Procedure 12(b)(6) or to stay proceedings. Much of that motion merely repeats the arguments that Harrison raises in its motion to dismiss. On September 1, 2004, the Fund filed the instant motion to dismiss Plaintiff's First Amended Complaint. Both the Service, as an agent of the Fund, and Harrison concur in this motion to the extent that the Fund's arguments equally apply to Plaintiff's claims against them. On November 16, 2004, the Service filed the instant motion to dismiss Plaintiff's complaint under Federal Rule of Civil Procedure 12(b)(6). Harrison concurs in this motion to the extent that the challenges that it raises equally apply to Plaintiff's claims against Harrison.

## II. ANALYSIS

Federal Rule of Civil Procedure 12(b)(6) permits a party to raise as a defense to a claim for relief in a pleading the opposing party's failure to state a claim upon which relief can be granted. Rule 12(b)(6) is designed to test whether, as a matter of law, a plaintiff is entitled to legal relief. *Nishiyama v. Dickson County*, 814 F.2d 277, 279 (6th Cir. 1987). Before dismissing a complaint for failure to state a claim upon which relief can be granted, a court must conclude "beyond [a] doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Carver v. Bunch*, 946 F.2d 451, 452 (6th Cir. 1991).

To survive a motion to dismiss under Rule 12(b)(6), a "complaint must contain either direct or inferential allegations respecting all the material elements to sustain a recovery under some viable legal theory." *Scheid v. Fanny Farmer Candy Shops, Inc.*, 859 F.2d 434, 436 (6th Cir. 1988). When considering a motion to dismiss, a court must construe the complaint in the light most favorable to the plaintiff and accept well-pleaded facts as true. *Columbia Natural Resources Inc. v. Tatum*, 58 F.3d 1101, 1109 (6th Cir. 1995). Thus, a court may not grant a

Rule 12(b)(6) motion based upon its disbelief of a complaint's factual allegations. *Id.* A court,

however, need not accept as true conclusions of law or unwarranted factual inferences. *Morgan*

*v. Church's Fried Chicken*, 829 F.2d 10, 12 (6th Cir. 1987).

Federal Rule of Civil Procedure 9(b) provides that, "[i]n all averments of fraud . . . , the

circumstances constituting fraud . . . shall be stated with particularity." *Compare Begala v. PNC*

*Bank, Ohio, Nat. Ass'n,* 214 F.3d 776, 781 (6th Cir. 2000) (holding that RICO pleadings are to be

liberally construed).

Rule 12(b) provides:

> If, on a motion asserting the defense . . . [of] failure to state a claim upon which
> relief can be granted, matters outside the pleading are presented to and not
> excluded by the court, the motion shall be treated as one for summary judgment
> and disposed of as provided in Rule 56, and all parties shall be given reasonable
> opportunity to present all material made pertinent to such a motion by Rule 56.

### A.  RICO Claims

The Court will proceed to discuss the following issues related to Plaintiff's RICO claims:

1)      whether the primary-jurisdiction doctrine mandates a stay of
        Plaintiff's RICO claims;

2)      whether the *Burford* doctrine mandates a stay of Plaintiff's RICO claims;

3)      whether the complaint pleads a predicate act of witness tampering;

4)      whether the complaint pleads predicate acts of mail/wire fraud with the necessary
        particularity;

5)      whether the complaint pleads the requisite pattern of racketeering activity as to
        each Defendant;

6)      whether the complaint pleads detrimental reliance to establish the necessary
        causation;

7)      whether the complaint pleads the requisite pattern of racketeering activity;

4

8)      whether the complaint pleads the necessary impact on interstate or foreign commerce;

9)      whether the complaint pleads a distinct criminal enterprise;

10)     whether the McCarran-Ferguson Act reverse-preempts Plaintiff's RICO claims; and

11)     whether the Labor Management Relations Act preempts Plaintiff's RICO claims.

## 1. The Primary-Jurisdiction Doctrine

In their motions to dismiss, Defendants contend that the primary-jurisdiction doctrine applies to Plaintiff's RICO claims. Plaintiff has filed a claim for workers' compensation benefits before the Workers' Disability Compensation Bureau ("the WDCB"), and is awaiting a final determination on that claim.[2]

The doctrine of primary jurisdiction's aim is to "promot[e] proper relationships between the courts and administrative agencies charged with particular regulatory duties." *United States v. Western Pac. R. R. Co.,* 352 U.S. 59, 63 (1956). Specifying when the doctrine of primary jurisdiction is applicable, the Supreme Court has held:

> . . . . 'Primary jurisdiction' applies where a claim is originally cognizable in the courts, and comes into play whenever enforcement of a claim requires a resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body; in such a case[,] a judicial

---

[2]On March 4, 2005, Magistrate Michael J. Barney of the WDCB issued an opinion finding, among other things, that Plaintiff's suffered closed periods of work-related disability stemming from work-related injuries on October 23, 2000, and October 19, 2001, and that the last of those periods of work-related disability ended on April 7, 2004, the day before Ray examined Plaintiff. This opinion, however, does not yet constitute a final decision by the WDCB as Plaintiff has filed a claim for review with the Workers' Compensation Appellate Commission, pursuant to M.C.L.A. 418.851. Moreover, M.C.L.A. 418.861 affords, in certain circumstances, the Michigan Court of Appeals and the Michigan Supreme Court the "power to review questions of law involved in any final order of the board." As such, the workers' compensation issue will not be resolved in the near future.

process is suspended pending referral of such issues to the administrative body for its views.

*Id.* at 63-64. Thus, the primary-jurisdiction doctrine applies where: 1) the Court has original jurisdiction over the claim before it; 2) the adjudication of that claim requires the resolution of certain underlying issues; and 3) a regulatory scheme commits the resolution of those issues to an administrative agency's special competence. In deciding whether the primary-jurisdiction doctrine applies in any given case, the court must determine whether the application of that doctrine in the particular case would serve the following twin rationales underlying that doctrine: 1) uniformity in questions of an administrative nature; and 2) the expert and specialized knowledge of the relevant agency to the issue in question. *Id.* at 64.

The threshold requirements for the applicability of the primary-jurisdiction doctrine are met here. First, despite Defendants' arguments to the contrary, the Court clearly has jurisdiction over Plaintiff's RICO claims.[3] Second, the adjudication of Plaintiff's RICO claims–i.e. that

---

[3]The Fund and the Service argue that, because Plaintiff's RICO claims hinge upon his entitlement to workers' compensation benefits, the WDCB, rather that this Court, possesses the subject-matter jurisdiction necessary to make that determination. (Fund's Mot. Br. at 6; Service Br. at 6.) In support, they rely upon Michigan law bestowing upon the WDCB exclusive jurisdiction over workers' compensation issues. (Fund's Mot. Br. at 5-6; Service Br. at 4-6.)

Yet, the Michigan legislature's bestowal of "exclusive jurisdiction" over workers' compensation claims upon the WDCB simply allocates the judicial power of and between the Michigan courts. Article III, Section 1, of the United States Constitution empowers only the United States Congress, not a state legislature, to "ordain and establish" the jurisdiction of inferior federal courts. As Article III, Section 2, of the Constitution makes clear, the federal judicial power shall extend to all cases arising under the Constitution or the laws of the United states, among others cases. Plaintiff's RICO claims clearly arise under federal law such that Article III bestows subject-matter jurisdiction upon this Court to entertain them and any underlying issues upon which those claims hinge. Indeed, the principal issue underlying the application of the primary-jurisdiction doctrine is whether a federal court should postpone the exercise of its jurisdiction in deference to an administrative agency; the application of that doctrine does not divest the Court of its subject-matter jurisdiction. *United States v. Philadelphia Nat'l Bank,* 374 U.S. 321, 353(1963).

6

Defendants engaged in a RICO enterprise fraudulently to deny Plaintiff workers' compensation benefits–hinge, in part, upon whether Plaintiff is entitled to those benefits in the first instance. Lastly, a regulatory scheme of the Michigan legislature commits the resolution of one's entitlement to workers' compensation benefits in the first instance to the special competence of the WDCB.  Specifically, Michigan's Workers' Disability Compensation Act ("the WDCA"), M.C.L. 418.841(1), provides:

> Any dispute or controversy concerning compensation or other benefits shall be submitted to the bureau and all questions arising under this act shall be determined by the bureau or a workers' compensation magistrate, as applicable.

The primary-jurisdiction doctrine's twin rationales are also met here.  Given the complicated medical issues underlying Plaintiff's entitlement to workers' compensation benefits, the WDCB, rather than the Court, possesses the necessary expertise and the specialized knowledge properly to resolve those underlying issues and, thus, the ultimate issue of Plaintiff's entitlement to benefits.  Deferring to the WDCB's determination of a plaintiff's entitlement to workers' compensation benefits in cases such as this would promote uniformity in such determinations.  Thus, a consideration of the relevant factors counsels in favor of applying the primary-jurisdiction doctrine to stay the adjudication of Plaintiff's RICO claims, if they survive the instant motion.

On the other hand, it is unclear whether the primary-jurisdiction doctrine properly applies in favor of a state administrative agency where the claim at issue arises under federal law and there is no competing federal forum.  73 C.J.S. Public Administrative Law and Procedure § 72. The majority of courts that have applied the primary-jurisdiction doctrine have done so in favor

7

of a federal administrative agency.[4]  *See Far East Conference v. United States*, 342 U.S. 570,

574-75 (1952) (applying the doctrine in favor of the Federal Maritime Board in the context of

federal claims); *Western Pac. R. R. Co.,* 352 U.S. at 63-64 (applying the doctrine in favor of the

Interstate Commerce Commission in the context of federal claims); *In re Long Distance*

*Telecommunications Litigation*, 831 F.2d 627, 631-32, 634 (6th Cir. 1987) (applying the doctrine

in favor of the Federal Communications Commission in the context of federal claims).

In *County of Suffolk v. Long Island Lighting Co.,* the United States Court of Appeals for

the Second Circuit held that, subject to a narrow exception, the primary-jurisdiction doctrine

does not apply in favor of a state administrative agency where there is a federal claim at issue

and where there is no competing federal forum.  907 F.2d 1295, 1310 (2d Cir. 1990) (holding

that the exception applies where a state administrative agency operates pursuant to a federal

legislative scheme).  The Second Circuit chiefly reasoned that the "theoretical underpinning of

the primary-jurisdiction doctrine . . . is the authority [that] *Congress* intended th[e]

[administrative] agency to exercise within a particular statutory scheme."  *Id.* (emphasis in

original)*; see Far East Conference,* 342 U.S. at 574-75 (addressing the doctrine in terms of a

---

[4]At least one federal court sitting in diversity jurisdiction has applied the primary-jurisdiction doctrine in favor of state administrative agencies.  *See Northwinds Abatement, Inc. v. Employers Ins. of Wausau,* 69 F.3d 1304, 1311 (5th Cir. 1995) (holding that, under the doctrine, the district court should have stayed the diversity-jurisdiction case pending the state workers' compensation commission's final decision on whether the defendant properly paid certain workers' compensation claims).  It is unclear, however, whether that federal court deferred to the state administrative agency's primary jurisdiction only on the ground that the *Erie* doctrine would compel such deferral.  *See* 73 C.J.S. Public Administrative Law and Procedure § 72; *Virginia Imports, Inc. v. Kirin Brewery of Am., LLC,* 296 F. Supp. 2d 691, 698, 698 n.1 (E.D. Va. 2003) (holding that, in a diversity-jurisdiction case involving only state claims, the primary-jurisdiction doctrine does not apply in favor of a state agency, as compared to a federal agency, and holding that, even if the doctrine were to apply, a federal district court sitting in diversity would defer to a state agency's primary jurisdiction only if state courts would so defer).

regulatory scheme that Congress created, and noting that courts and administrative agencies are "means adopted to attain the prescribed end . . . through co-ordinated action"). The Second Circuit elaborated that, "[i]n the federal question/federal agency context, the creation of an agency and the grant to it of certain adjudicative authority may evince a congressional intent to limit the judiciary's jurisdiction." *County of Suffolk,* 907 F.2d at 1310. As the Court pointed out, "the independent act of a state legislature in creating a particular administrative body . . . can shed no light on *Congress'* intent to limit the jurisdiction of the federal courts[.]" *Id.* at 1311. While finding that the agency-expertise rationale underlying the primary-jurisdiction doctrine was implicated in the case, the Court underscored that it is that doctrine's theoretical underpinnings that control its applicability, "not the functional competence of an agency[.]" *Id.* at 1310.

However, in the subsequent case of *Johnson v. Nyack Hospital,* the Second Circuit held that, under the primary-jurisdiction doctrine, the district court should have stayed the plaintiff's federal antitrust claim pending a state administrative agency's determination of the complicated factual issues underlying that claim. 964 F.2d 116, 122-23 (2d Cir. 1992) (noting that, under the distinct doctrine of exhaustion, the issue is whether Congress' statutory intent was to render a federal claim cognizable only in the first instance by an administrative agency, whether state or federal). While recognizing that most cases applying the primary-jurisdiction doctrine did so in favor of a federal administrative agency, the Court reasoned that the application of that doctrine there served the underlying rationales of agency expertise and judicial economy. *Id.* The Court neither mentioned nor distinguished *County of Suffolk.* Thus, it is unclear what remains, if anything, of the precedential value of *County of Suffolk.*

As discussed below, in any event, the *Burford* doctrine would compel the stay of Plaintiff's RICO claims pending  the WDCB's final determination of Plaintiff's entitlement to workers' compensation benefits.

## 2. *Burford* Abstention Doctrine

The *Burford* abstention doctrine takes its name from the Supreme Court's decision in *Burford v. Sun Oil Co.,* 319 U.S. 315 (1943).  In *Rouse v. DaimlerChrysler Corporation,* the United States Court of Appeals for the Sixth Circuit underscored that the aim of the *Burford* doctrine is to "avoid conflict with a state's administration of its own affairs."  300 F.3d 711, 716 (6th Cir. 2002).  The Sixth Circuit held that, therefore, the *Burford* doctrine "applies only if a federal court's decision on a state law issue is likely to 'interfere with the proceedings or orders of state administrative agencies.'"  *Id.* (internal quotation marks omitted).  The Sixth Circuit further held:

> The *Burford* abstention [doctrine] should not be applied unless: (1) a case presents 'difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar,' or (2) the 'exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern.'

*Id.* (citing *Colorado River Water Conservation District v. United States,* 424 U.S. 800, 814 (1976)); *see Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 727 (1996) (implicitly recognizing that the *Burford* doctrine may apply where the case involves either a "state-law claim" or "an assertion that the federal claims [were] . . . entangled in a skein of state law that must be entangled before the federal case can proceed") (internal quotation marks omitted).  Since *Burford*, the Supreme Court has held that a federal court may dismiss or remand a complaint "based on abstention principles only where the relief being sought is equitable or otherwise

10

discretionary." *Quackenbush,* 517 U.S. at 731 (illustrating such equitable or discretionary relief with suits for injunctive relief or certain classes of declaratory judgments). However, the Court noted that, in actions "at law" or for damages, it has only permitted federal courts, based on abstention principles, to "enter a stay order that *postpones* adjudication of the dispute, not to dismiss the federal suit altogether." *Id.* at 719.

The Fund contends that, under the *Burford* doctrine, the Court should stay the adjudication of Plaintiff's RICO claims pending the WDCB's final determination of Plaintiff's entitlement to workers' compensation benefits in the first instance. (Fund Br. at 9.) Plaintiff, in response, maintains that the Fund has failed to present any meaningful argument on the applicability of the *Burford* doctrine to Plaintiff's RICO claims. (Resp. to Fund at 11.) However, the *Burford* doctrine implicates important issues of comity.

The determination of Plaintiff's entitlement to workers' compensation benefits in this federal forum would likely frustrate or undermine Michigan's workers' compensation scheme, as set forth in the WDCA. That administrative scheme is comprehensive, setting forth the nature and amount of the particular benefits to which it affords entitlement, the scope of any such entitlement, and the administrative and judicial processes for resolving any disputes regarding that entitlement. As even a cursory review of Dr. Ray's medical report demonstrates, the determination of Plaintiff's entitlement to workers' compensation benefits hinges upon complex medical issues. Given the expertise and specialized knowledge necessary to resolve such underlying issues properly, the determination of Plaintiff's entitlement to workers' compensation benefits in this federal forum may result in an adjudication that would be contrary to that of the WDCB. Indeed, the frequent resolution, in a federal forum, of a plaintiff's entitlement to

11

workers' compensation benefits in cases such as this would likely undermine the uniformity and coherence in such determinations that Michigan seeks to achieve via its establishment of the WDCB.

Contrary to Plaintiff's assertion, an employee's entitlement to workers' compensation benefits bears upon "policy problems of a substantial public import" or "matter[s] of substantial public concern." *See Rouse,* 300 F.3d at 716. (Resp. to Fund at 10.) As the Michigan Supreme Court has declared:

> The primary purpose of the . . . [WDCA] is to provide benefits to the victims of work-related injuries by allocating the burden [of] these payments to the employer and, therefore, ultimately, to consumers. An employee who suffers an injury arising out of and in the course of his employment will be eligible for compensation regardless of whether the employer was at fault. In return, the employer is immunized from tort liability because the . . . [WDCA], under M.C.L. § 418.131(1) . . . , provides that this compensation is the exclusive remedy for a personal injury, except for an injury resulting from intentional tort. Thus, . . .[the WDCA's] purpose is to provide . . . not only for employees a remedy which is both expeditious and independent of proof of fault, but also for employers a liability which is limited and determinate.

*Simkins v. General Motors Corp.,* 453 Mich. 703, 710 (Mich. 1996). Thus, an employee's entitlement to workers' compensation benefits bears upon Michigan's significant interest in safeguarding the policy balance that the legislature struck in the WDCA by ensuring employees' speedy and no-fault recovery of guaranteed compensation for work-related injuries and by shielding employers, in exchange for providing their employees with such compensation, from liability beyond that which the WDCA permits. Moreover, both Michigan's employers and their employees have substantial interests in gaining their respective benefits from that regulatory balance. In determining an employee's entitlement to workers' compensation, a federal forum may not be as adept at navigating that policy balance as the WDCB, to which the Michigan

12

Legislature entrusted that task in the first instance.  Moreover, the improper denial of an employee's entitlement to workers' compensation benefits for a work-related disability would be of great public important were that employee, consequently, to become a ward of the state.

Comparatively-speaking, in contrast to its substantial interest in resolving the federal-law issues of Plaintiff's RICO claims, this federal forum would have minimal interest in determining Plaintiff's entitlement to workers' compensation benefits.  Thus, the Court would stay Plaintiff's RICO claims if they survived the instant motion, based on Plaintiff's claim of entitlement to workers' compensation benefits, pending a final determination of Plaintiff's entitlement to those benefits via Michigan's workers' compensation scheme.

### 3.  RICO Claims

The RICO Act, 18 U.S.C. § 1961, *et seq.,* affords a civil remedy when an individual is "injured in his business or property" by virtue of a violation of § 1962 of the Act.  *See* 18 U.S.C. § 1964(c)(providing that the person may "recover threefold the damages [that] he sustains and the cost of the suit, including a reasonable attorney's fee").  Section 1962(c) of the RICO Act provides, in part:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . .

18 U.S.C. § 1962(c).

The RICO claims that Plaintiff's complaint sets forth solely arise under § 1962(c).[5]  In

---

[5]Plaintiff contends that his complaint also pleads RICO claims under 18 U.S.C. § 1962(a). (Resp. to Service at 4.)  Section 1962(a) provides in part:

> It shall be unlawful for any person who has received any income derived, directly

the instant motions to dismiss, Defendants contend that Plaintiff's complaint, however, fails to plead claims under § 1962(c) for which relief may be granted.

The elements of a viable cause of action under 18 U.S.C.§ 1962(c) are: 1) the conduct 2) of an enterprise 3) through a pattern 4) of racketeering activity. *Central Distributors of Beer, Inc. v. Conn*, 5 F.3d 181 (6th Cir. 1993)(quoting *Sedima v. Imrex,* 473 U.S. 479, 496 (1985)). Section 1961(1)(B) of the RICO Act defines the requisite "racketeering activity" to include, as a predicate act, "any act which is indictable under any of the following provisions of title 18, United States Code . . . section 1341 (relating to mail fraud), section 1343 (relating to wire fraud), . . . [and] section 1512 (relating to tampering with a witness, victim, or an informant)[.]" 18 U.S.C. § 1961(1)(B). Section 1961(5) of the RICO Act mandates that the requisite "pattern of racketeering activity" include at least two acts of such activity, which must have occurred within a ten-year period. 18 U.S.C. § 1961(5).

---

or indirectly, from a pattern of racketeering activity . . . to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

Plaintiff argues that his complaint pleads claims under § 1962(a) because it alleges that Defendants fraudulently deprived him of money. (Resp. to Service at 4.) According to Plaintiff, this allegation necessarily implies that Defendants violated § 1962(a). (*Id.*) In support, Plaintiff asserts that, if Defendants defrauded Plaintiff out of his workers' compensation benefits, they "used" the money retained from those benefits in the "operation" of an "enterprise" since Defendant clearly did not "burn the money." (*Id.* at 5.) Rather, according to Plaintiff, Defendants spent the money "on wages or supplies or rent or distributed it as profit while participating in the enterprise." (*Id.*) Plaintiff argues that "an allegation of fraud is an allegation that the enterprise took money and 'used' it in its activities." (*Id.*)

However, the inferences necessary to plead claims under § 1962(a) cannot reasonably be drawn from the allegations in Plaintiff's complaint. This failure to expend does not amount to "income" from a pattern of racketeering activity. Thus, Plaintiff's complaint fails to plead claims under § 1962(a).

14

### a. Predicate Acts

Plaintiff's complaint appears to allege seven distinct predicate acts.  The complaint seems to allege the following predicate acts of mail fraud under 18 U.S.C. § 1341, which allegations are summarized as follows:[6]

1)   On July 24, 2003, the Fund, via employee Jackson and from Farmington Hills, Michigan, mailed through the U.S. mail to Plaintiff in Taylor, Michigan, a Notice of Dispute terminating Plaintiff's workers' compensation benefits on the ground that he was "fully released to [his] job"; this termination was fraudulent because Defendants knew that Dr. Smith and Dr. Balarezo had not fully released Plaintiff to his job, and Harrison subsequently refused to permit Plaintiff to work within his restrictions  (Compl. at ¶ 9(c), (d));

2)   On March 25, 2004, the Fund and the Service sent to Plaintiff in Taylor, Michigan, via the U.S. mail a notice of examination by Ray; this notice was part of Defendants' fraudulent scheme to deprive Plaintiff of his workers' compensation benefits in that Defendants, through their attorney, Thaddeus Felker, relied upon Ray to use that examination to provide a false "cut off" medical report by which Defendants could terminate such benefits, rather than to examine Plaintiff objectively or truthfully (Compl. at ¶ 9(f));

3)   After April 8, 2004, but before April 26, 2004, Ray, in Warren, Michigan, mailed via the U.S. mail to the Fund and the Service in Farmington Hills, Michigan, the report of his April 8, 2004, medical examination of Plaintiff, which report fraudulently stated that Plaintiff was no longer disabled due to a work-related condition (Compl. at ¶ 9(f));

4)   On April 26, 2004, Defendants' agent, attorney Felker, in Birmingham, Michigan, mailed Ray's report, via the U.S. mail, to Plaintiff's attorney in Southfield, Michigan (Compl. at ¶ 9(f)); and

5)   On April 16, 2004, the Fund, via employee Jackson, mailed from Farmington Hills, Michigan, via the U.S. mail to Plaintiff in Taylor, Michigan, a Notice of Dispute stating "no work[-]related disability"; this statement was fraudulent in that Defendants knew that Dr. Smith had found Plaintiff disabled and that Dr. Ray

---

[6]Plaintiff argues that his complaint only alleges three predicate acts of mail fraud, without expressly identifying those acts.  It is unclear whether this assertion by Plaintiff constitutes a disavowal of reliance upon any other acts of mail fraud or merely reflects a counting error. (Resp. to Harrison at 3, 4, 7; Resp. to Fund at 5.)

had not objectively examined Plaintiff (Compl. at ¶ 10.).

Allegations 2 -5 relate to the medical examination/diagnosis of Defendant Ray.  The complaint

also alleges a predicate act of mail and/or wire fraud under 18 U.S.C. §§ 1341 or 1343,

respectively.[7]  The allegations that potentially relate to this predicate act are summarized as

follows:

> 6)      Defendants expressly or tacitly communicated to Dr. Ray that it wanted to obtain
> a "cut off" medical report, and Dr. Ray knew that he was not to perform an
> objective examination of Plaintiff.  Defendants used the mail and electronic
> communications to further this fraud by communicating amongst each other to
> perpetrate this fraud.  Defendants used the wires for interstate communications in
> effectuation of their scheme.  (Compl. at ¶¶ 9(f), 16.)

The complaint also alleges a predicate act of witness tampering, as follows:

> 7)      Defendants' actions violated 18 U.S.C. § 1512.  (Compl. at ¶ 11).

### (1)  Witness Tampering

Harrison argues that Plaintiff's complaint fails to sufficiently plead a predicate act of

witness tampering under 18 U.S.C. § 1512.  (Harrison Reply at 3.)  Paragraph 11 of Plaintiff's

complaint alleges the totality of Plaintiff's claim regarding § 1512:

> Defendants' actions violated 18 U.S.C. § 1512.  This allegation is based in part on
> information and belief, and are likely to have evidentiary support after a
> reasonable opportunity for investigation and discovery.

This is not a sufficient pleading to proceed further on his claim, given the motion to

dismiss.  This claim does not explain how Defendants' actions violated § 1512.  Accordingly, the

Court dismisses Plaintiff's claim of a RICO violation tied to 18 U.S.C. § 1512.

---

[7]Perhaps to anticipate a finding of insufficient pleading, Plaintiff seemingly disavows any
reliance upon this wire-fraud allegation.  Rather, according to Plaintiff, his complaint pleads
"four predicate acts (three acts of mail fraud plus witness tampering/obstruction of justice)."
(Pl.'s Resp. to Harrison at 3, 4, 7; Pl.'s Resp. to Fund at 5.)

### (2)  Mail and/or Wire Fraud

A plaintiff must prove each element of the predicate act or "racketeering activity" for a civil action under the RICO Act to lie.  *Central Distributors of Beer, Inc. v. Conn,* 5 F.3d 181, 183-84 (6th Cir. 1993).  "To allege a violation of the mail fraud statute, it is necessary to show that: 1) the defendants formed a scheme or artifice to defraud; 2) the defendants used the United States mails or caused a use of the United States mails in furtherance of the scheme; and 3) the defendants did so with the specific intent to deceive or to defraud."  *Id.* at 184 (citing *Schreiber Distributing v. Serv-well Furniture*, 806 F.2d 1393, 1399 (9th Cir. 1988)).

Where a plaintiff relies upon mail or wire fraud to constitute a predicate act under RICO, Rule 9(b) requires that he must allege, at a minimum, the time, place, and contents of the fraudulent communications. *Bender v. Southland Corp.,* 749 F.2d 1205, 1216 (6th Cir. 1984).

### (a) Requisite Particularity

In its motion to dismiss, Harrison contends that Plaintiff's complaint fails, as a matter of law, to plead the predicate acts of wire or mail fraud underlying his RICO claims with the particularity that Rule 9(b) requires.  (Harrison Br. at 4-5.)  Specifically, Harrison contends that Plaintiff's complaint fails to plead the time, place, and contents of the communications underlying the alleged predicate acts of mail and/or wire fraud. (*Id.*)

Federal Rule of Civil Procedure 9(b) states:

In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity.  Malice, intent, knowledge, and other condition of mind of a person may be averred generally.

Plaintiff's complaint pleads the time, place, and contents of the communications that he claims underlie five alleged predicate acts of mail fraud, per paragraphs 9(c),(d),(f), and 10 and

17

as numbered 1-5 above.[8]  Indeed, Plaintiff's complaint alleges the time of each mailing, the sender and recipient of each mailing, the locations of the sender and recipient of each mailing, the content of each mailing, and how each mailing relates to the alleged RICO fraudulent enterprise.  (1st Am. Compl. at ¶¶ 9(c),(d),(f), 10.)

As to the sixth predicate act of mail and/or wire fraud, per paragraphs 9(f) and 16 and numbered as six above, Plaintiff's complaint fails to plead the time, place, or contents of that communication.  (Compl. ¶ ¶ 9, 16.)  In *Rotella v. Wood,* the United States Supreme Court affirmed that Rule 11(b)(3) provides some "flexibility" concerning Rule 9(b)'s particularity requirement. 528 U.S. 549, 560 (2000) (citing *Corley v. Rosewood Care Center, Inc. of Peoria,* 142 F.3d 1041, 1050-51 (7th Cir. 1998), in which the court relaxed Rule 9(b)'s particularity requirements where the RICO plaintiff lacked access to all facts necessary to detail his claim). On the other hand, as Harrison notes, while Rule 11(b)(3) may relax Rule 9(b)'s particularity requirement, it cannot be construed to eviscerate that requirement in its entirety by permitting rank speculation.  The Court strikes from the complaint this predicate act.  Accordingly, the Court will not consider it as to further discussion of this motion.

---

[8]The Fund argues that, because the WDCA required Defendants to mail to Plaintiff the notice of examination by Ray, Ray's report, and the notices of dispute underlying these predicate acts of mail fraud, *See* M.C.L. 418.315 and WDCB Rule 408.33(1), such mailings cannot trigger liability under the RICO Act.  (Fund's Br. at 6-7.)  Yet, the mailing of those documents gives rise to predicate acts under the RICO Act, not only where the documents are fraudulent.  *See Dana Corp. v. Blue Cross & Blue Shield Mut. of Northern Ohio,* 900 F.2d 882 (6th Cir. 1990) (holding that, in a civil RICO case predicated upon mail fraud by its health care benefits' adjuster, the plaintiff employer sufficiently alleged scheme to defraud and mailing for purpose of executing that scheme, even if the contract required the bills and invoices in question such that they would have been sent regardless of whether the alleged scheme existed).  In *Dana Corp.*, the Sixth Circuit ruled that the Supreme Court had held in *Schmuck v. United States,* 109 S. Ct. 1443, 1449 (1989), that mailings that contain no false information themselves can still be sufficient to be part of the mail fraud.  *Id.*

**(b)  Pattern of Racketeering Activity as to Each Defendant**

 Harrison contends that Plaintiff's complaint fails to plead that Harrison committed at least two predicate acts of mail and/or wire fraud.  (Harrison Br. at 4-5.)  In essence, Harrison argues that Plaintiff must specifically allege predicate acts attributable to Harrison, rather than predicate acts attributable to other Defendants or unidentified employees associated with Harrison.  (*Id.* at 7.)  Plaintiff concedes that the complaint does not allege any communications, whether fraudulent or otherwise, by Harrison or one of its employees.  (Resp. to Harrison at 5.) Plaintiff argues that his complaint, nevertheless, alleges fraudulent communications that are attributable to Harrison because individuals acting in concert with Harrison, as part of the fraudulent enterprise, made those communications.  (*Id.*)

The Court finds instructive *In re American Honda Motor Company, Inc. Dealerships Relations Litigation,* 958 F. Supp. 1045 (D. Md. 1997), the authority upon which Plaintiff relies. In that case, the district court refused to dismiss the plaintiffs' civil RICO claim under § 1962(c) based upon predicate acts of mail fraud.  *Id.* at 1048, 1055.  The court expressly held that, for liability under § 1962(c), it is insufficient that a defendant "conduct[ed] or participate[d] directly or indirectly, in the conduct of [an] enterprise's affairs"; rather, the defendant must also have done so "through a pattern of racketeering activity."  *Id.* at 1057-58.  Thus, the district court, in essence, held that each defendant must engage in the requisite "pattern of racketeering activity"- i.e. the commission of at least two predicate acts.

As to the defendant law firm in *American Honda* alleged to have "participated in managing the concealment of the illegal scheme," the court noted that the plaintiffs' complaint did not allege that the law firm mailed any of the fraudulent materials.  *Id.* at 1048, 1057.  The

19

court observed that, unless aiding and abetting principles were to apply, the defendant law firm

could not have engaged in the predicate acts of mail fraud. *Id.* at 1057. The court then held that

aiding and abetting principles apply to the substantive predicate acts under § 1961(1) and, thus,

to the determination of whether a defendant participated in the enterprise through a "pattern of

racketeering activity."[9] *Id.* at 1058-59 (relying, in part, upon 18 U.S.C. § 2, which renders an

individual who aids and abets in an offense against the United States punishable as a principal).

According to the court, the application of such principles to the predicate acts under § 1961(1)

---

[9]As the district court in *General Motors Corporation v. Ignacio Lopez de Arriortua,* 948 F.
Supp. 670 (E.D. Mich. 1996), pointed out:

> In *Central Bank* [*of Denver, N.A. v. First Interstate Bank of Denver, N.A.,* 511
> U.S. 164 (1994)], the Court held that there was no aiding and abetting liability
> under section 10(b) of the Securities and Exchange Act because Congress did not
> expressly impose such liability. The phrase 'directly or indirectly' as used in the
> statute did not suffice to impose aiding and abetting liability. Since *Central Bank,*
> lower courts have considered whether the *Central Bank* ruling means that there is
> no[] aider and abettor liability under RICO, because, like the Securities and
> Exchange Act, RICO does not expressly provide for such liability. Courts are in
> disagreement on whether one can be liable for aiding and abetting under section
> 1962(c).

In *Reves v. Ernst & Young*, the Supreme Court held that, to have "conduct[ed] or
participate[d], directly or indirectly, in the conduct of [an] enterprise's affairs" for purposes of §
1962(c), a person must have had an operational or management role in the enterprise. 507 U.S.
170, 185 (1993). The Court further noted that the term "participate" in § 1962(c) has a narrower
meaning than to "aid and abet." *Id.*
In *American Honda Motor Company,* the district court held that *Reves* implicitly
forecloses the application of aiding and abetting principles to the determination of whether a
person "conduct[ed] or participate[d], directly or indirectly, in the conduct of [an] enterprise's
affairs." 958 F. Supp. at 1058-59. However, in finding that aiding and abetting principles apply
to the substantive predicate acts in § 1961(1), the district court eschewed the notion that it was
"bringing through the back door that which *Reves* bars at the front." *Id.* at 1058. Rather,
according to the court, the distinction between the applicability of aiding and abetting principles
to § 1961(1) as compared to § 1962 (c) itself "is key to a proper understanding of *Reves,* and it
brings within the ambit of § 1962 (c) precisely those defendants who belong there," as discussed
above. *Id.*

would afford a "principled basis for imposing § 1962(c) liability upon a class of defendants whom Congress surely intended . . . [to] be within the statute's purview: leaders of enterprises who do not themselves commit predicate acts but who cause others to do so"; otherwise, "the highest-level managers of a criminal enterprise who leave the hands-on work to others would be excluded from liability under § 1962(c) by virtue of the "through a pattern of racketeering activity" phrase."[10] *Id.* at 1058-59. The court then found that the defendant law firm aided and abetted in the commission of the predicate acts of mail fraud. *Id.* at 1059.

Finding *American Honda Motor Company* persuasive, the Court holds that aiding and abetting principles and/or the language of the mail fraud statute–"causes to be deposited"–apply to the substantive predicate acts under § 1961(1), including predicate acts of mail and/or wire fraud, and, thus, to the determination of whether a defendant participated in the enterprise through a "pattern of racketeering activity." Plaintiff's complaint specifically alleges that: 1) the Fund, either itself or via its employee Cindy Jackson, committed three predicate acts of mail fraud by mailing two fraudulent Notices of Dispute and one fraudulent notice of examination to Plaintiff (Compl. at ¶¶ 9(c), 9(f), and 10.); 2) Ray committed one predicate act of mail fraud by mailing his fraudulent report (*Id.* at ¶ 9(f)); and 3) Attorney Felker, Defendants' agent, mailed Ray's fraudulent report (*Id.*).

Drawing all reasonable inferences from the allegations in Plaintiff's complaint in the non-moving party's favor, the Court finds that Plaintiff's complaint gives rise to a reasonable

---

[10]The court, in *American Honda*, noted, however, that some of the statutes that § 1961(1) lists as predicate acts "themselves render culpable not only persons who commit the prohibited acts but also persons who cause the acts to be committed." 958 F. Supp. at 1059 n. 12. As the court illustrated, the mail-fraud statute, 18 U.S.C. § 1341, employs the language "causes to be deposited" and "causes to be delivered." *Id.*

inference that Harrison could be liable, under aiding and abetting and/or "causation" principles, for at least two predicate acts of mail and/or wire fraud.  The alleged predicate acts of mail fraud surround Plaintiff's entitlement to workers' compensation benefits as well as the termination of those benefits.  Plaintiff's complaint alleges that "[d]ecision regarding paying claims or terminating payment were made jointly by [D]efendant corporations, or were made by the Fund and/or the Service . . . after consulting with each other and Harrison."  (Compl. at ¶ 4.)  Thus, Plaintiff's complaint alleges that Harrison participated, with the corporate Defendants, in making decisions regarding Plaintiff's entitlement to workers' compensation benefits.

In his motion to dismiss, Ray argues that Plaintiff's complaint fails to plead at least two predicate acts of mail and/or wire fraud that are attributable to Ray.[11] (Ray Mot. at 5.)  Plaintiff's complaint specifically alleges that Ray himself committed one predicate act of mail fraud by mailing his report.  (Compl. at ¶ 9(f)) Drawing all reasonable inferences from the allegations in Plaintiff's complaint in Plaintiff's favor, the Court finds that Plaintiff's complaint gives rise to a reasonable inference that Ray is liable, under aiding and abetting and/or "causation" principles,

---

[11]Ray also contends that Plaintiff's complaint neither alleges how Ray's medical report was fraudulent nor how any such report would have furthered the fraudulent RICO enterprise.  (Mot. at 5-6; Reply at 4.)  However, such a contention is incorrect.

Rather, Plaintiff's complaint alleges that: 1) Plaintiff's October 23, 2000, work-related injury permanently disabled him from unrestricted manual labor (Compl. at ¶ 7.); 2) in 2003, Dr. Smith, Defendants' doctor, determined that Plaintiff could only work with restrictions (*Id.* at ¶ 9 (a),(b)); 3)  Dr. Balarezo, Plaintiff's doctor, determined that Plaintiff was not fully released to his job (*Id.* at ¶ 9 (c)); 4) Felker allegedly advised Defendants that Ray could provide a false "cut-off" report by which to terminate Plaintiff's workers' compensation benefits (*Id.* at ¶ 9(f)); 5) Defendants communicated to Ray that they wanted a cut-off report and let it be known that he was not to perform an objective examination of Plaintiff; and 6) Ray examined Plaintiff and provided a medical report of that examination, which advised that Plaintiff was no longer disabled due to a work-related condition, with the purpose of giving Defendants a false "cut-off" report rather than objectively examining or reporting on Plaintiff's condition (*Id.*).

for at least one more predicate act of mail and/or fraud.  Plaintiff's complaint specifically alleges that the Fund, via its employee Cindy Jackson, committed a predicate act of mail fraud by mailing a fraudulent Notices of Dispute based upon Ray's fraudulent medical report, and that the corporate Defendants, via Felker, committed another predicate act of mail fraud by mailing Ray's fraudulent report.   (Compl. at ¶¶ 9(f), 10.)

The Service, in its motion to dismiss, argues that Plaintiff's complaint fails to plead that the Service committed any predicate acts of mail and/or wire fraud because the Service was a defunct corporation that no longer operated during the time of those alleged acts.  (Service Br. at 2.)  In support, Defendant Service contends that it adjusted workers' compensation claims on behalf of Harrison, including the initial benefits claim that Plaintiff submitted to Harrison, until December 31, 2002, when the Fund terminated its contract with the Service.  (*Id.* at 3.)  According to the Service, since January 1, 2003, it has not adjusted any claims on behalf of Harrison and, indeed, ceased its operations and became defunct on that date.  (*Id.*)  The Service contends that the Fund and its employees, such as Cindy Jackson, assumed the operations and duties of the Service.  (*Id.*)

Plaintiff's complaint does not allege any predicate acts that occurred before January 1, 2003.  Moreover, at oral argument, Plaintiff conceded that the Service was no longer in existence as of January 1, 2003.  Rather, according to Plaintiff, Cindy Jackson, who originally worked for the Service, stopped working for the Service and starting working for the Fund after the Service ceased operations.  Based upon this concession, Plaintiff's complaint fails to plead at least two predicate acts that are attributable to the Service and, thus, fails to plead a RICO claim against

23

the Service for which relief may be granted.[12]  *See* 18 U.S.C. § 1961(5).  The Court, therefore, DISMISSES Plaintiff's RICO claim against the Service.

**(c)  Detrimental Reliance as an Element of Mail and/or Wire Fraud Claims Under RICO**

In its motion to dismiss, Harrison contends that Plaintiff's complaint must allege that Plaintiff detrimentally relied upon the communications underlying the predicate acts of mail and/or wire fraud as an element of those acts.  Plaintiff contends otherwise.

In *Blount Financial Services, Inc. v. Walter E. Heller & Co.,* 819 F.2d 151, 152-53 (6th Cir. 1987),* the United States Court of Appeals for the Sixth Circuit held that a civil RICO complaint involving a predicate act of mail fraud must allege "with particularity the false statement of fact made by the defendant which the plaintiff relied on and the facts showing the plaintiff's reliance on defendant's false statement of fact" to establish the "scheme to defraud" element of mail fraud.  *Accord Bender v. Southland Corporation,* 749 F.2d 1205, 1216 (6th Cir. 1984); *Central Distributors of Beer, Inc. v. Conn,* 5 F.3d 181, 184 (6th Cir. 1993).  The Sixth Circuit continues to espouse this holding.[13]

---

[12]In any event, even if at least two of the predicate acts of mail and/or wire fraud that the complaint alleges were attributable to the Service, Plaintiff's RICO claims based upon those acts fail to state claims for which relief may be granted, as discussed below.

[13]*See VanDenBroeck v. Commonpoint Mortgage Co.,* 210 F.3d 696, 701 (6th Cir. 2000) (holding, in a civil RICO case based upon predicate acts of mail and wire fraud, that the plaintiff must plead "a material misrepresentation of fact that was calculated or intended to deceive persons of reasonable prudence and comprehension," and that the plaintiff "relied upon that material misrepresentation" to establish the fraud statutes' requisite "scheme to defraud"); *Armbruster v. K-H Corporation,* 206 F. Supp. 2d 870, 898 (E.D. Mich. 2002) (relying upon *Blount,* 819 F.2d at 152, and *Bender,* 749 F.2d at 1215, to hold that a civil RICO complaint based upon predicate acts of mail fraud must plead the plaintiff's reliance upon the defendant's misrepresentation); *Paycom Billing Services, Inc. v. Payment Resources Int'l,* 212 F. Supp. 2d 732, 736 (W.D. Mich. 2002) (relying upon *VandenBroeck,* 210 F.3d at 701, to hold that a civil RICO complaint based upon predicate acts of mail fraud must plead the plaintiff's reliance upon

While reliance is not a predicate-act requirement that must be pleaded in order to state a claim under RICO, the Sixth Circuit recently noted that "*Central Distributors* [*v. Conn.,* 5 F.3d 181, 184 (6th Cir. 1993),*]* held that a showing of reliance is required to establish standing in civil RICO cases, a holding that is not in conflict with the Supreme Court's decision in *Neder* [*v. United States,* 527 U.S. 1 (1999),*]* or this Court's decision in [*United States* v.] *Daniel,* [329 F.3d 480 (6th Cir. 2003)]." *Chaz Construction, L.L.C. v. Codell,* No. 04-5200, 2005 WL — (6th Cir. May 11, 2005) (unpublished opinion).  In *Chaz Construction,* the Sixth Circuit recognized that, per *Neder*, the common-law requirement of justifiable reliance has no place in federal fraud statutes, to wit, that reliance is not an element of mail or wire fraud.  *Id.*  At the same time, *Chaz Construction* noted that standing is not required in criminal prosecutions, and, "[t]herefore, the holding in *Central Distributors* that plaintiffs must plead reliance in order to establish standing in a civil RICO case does not conflict with the holdings in *Neder* and *Daniel* . . . . " *Id.*

Plaintiff argues that his complaint sufficiently pleads his detrimental reliance upon Defendants' fraudulent communications underlying the predicate acts of mail and/or wire fraud, if such a showing were required.  (Resp. to Harrison at 11.)  Plaintiff's complaint, per paragraph 12, avers:

> Plaintiff relied on the fraudulent communications to the extent [that] he suffered the financial loss of having to pay attorney fees, medical care and medical mileage.  Defendants' fraud directly caused injury to [P]laintiff because it deprived him of workers['] compensation benefits and because it caused him the expense of paying attorney fees, medical care and mileage to and from medical care.

As Harrison and Ray note, however, Plaintiff's complaint pleads, in essence, that he

---

the defendant's material misrepresentation).

relied upon the alleged fraudulent communications by challenging and disclaiming the truthfulness or validity of the content of those communications, rather than assuming the truthfulness or validity of such content and by taking actions based upon that assumption to his detriment.  (Harrison Reply at 5; Ray Mot. at 9.)  Yet, the plaintiff must detrimentally rely upon the alleged fraudulent communications by virtue of being "deceived by" them.  *See Grantham and Mann, Inc. v. American Safety Products., Inc.,* 831 F.2d 596, 606 (6th Cir. 1987).

Here, three of the six predicate acts of mail and/or wire fraud in Plaintiff's complaint, as numbered 1, 4, and 5 above, involve the mailing of Notices of Dispute setting forth the alleged reason for Defendants' denial of Plaintiff's workers' compensation benefits or the mailing of Ray's medical report stating that Plaintiff no longer had a work-related disability.  (Compl. at ¶ 9(c), (d) (f).)  However, instead of detrimentally relying upon those communications by virtue of being deceived by their content, Plaintiff, as their complaint acknowledges, challenged the validity of that content in the first instance.  Thus, Plaintiff's injury arose, not from his reliance upon such fraudulent communications, but, rather, from Defendants' denial of Plaintiff's workers' compensation benefits.  *See Grantham*, 831 F.2d at 606.

Moreover, a plaintiff cannot detrimentally rely upon any alleged fraudulent communications that were not directed to him.  *Cf. Central Distributors of Beer, Inc. v. Conn*, 5 F.3d 181 (6th Cir. 1993). Here, an additional two of the six predicate acts of mail and/or wire fraud, as numbered 3 and 6 above, allege fraudulent communications by Defendants that were not directed at Plaintiff; rather, they involve Ray mailing his medical report to the Service and the Fund, and Defendants "expressly or tacitly communicat[ing]" to Ray that they wanted to obtain a cut-off report.  (Compl. at ¶¶ 9(f), 16.)  As to the remaining predicate act of mail fraud,

26

as numbered 2 above, Plaintiff's complaint does not allege how he detrimentally relied upon the notice of examination by Ray that Defendants mailed to him. (Compl. at ¶ 9(f)).

The Court, therefore, DISMISSES Plaintiff's RICO claims for failure to meet the key element of "reliance."

### b. Requisite "Pattern of Racketeering Activity"

Defendants argue that, even if Plaintiff's complaint were properly to plead at least two predicate acts, those acts would be insufficient to establish the requisite "pattern" of such activity. (Harrison Br. at 6; Ray Mot. at 6.) In *H.J., Inc. v. Northwestern Bell Telephone Company,* the United States Supreme Court observed that, while the RICO Act, 18 U.S.C. § 1961(5), sets forth the minimum number of predicate acts necessary to establish the requisite "pattern of racketeering activity," it presumes that the requisite pattern entails something "beyond simply the number of predicate acts involved." 492 U.S. 229, 237 (1989). Rather, the Court held that, to establish a "pattern of racketeering activity," the plaintiff must demonstrate that the predicate acts are related and that they amount to, or threaten the likelihood of, continuing racketeering activity. *Id.* at 239-240.

As the Court elaborated, the issue of whether predicate acts are related depends upon such factors as whether the predicate acts "have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *Id.* at 240 (internal quotation marks omitted).

Harrison argues that the predicate acts that Plaintiff's complaint pleads are not "sufficiently contiguous and related in all relevant factors to as to constitute" the requisite pattern. (Harrison Br. at 7.) However, those predicate acts, as alleged in Plaintiff's complaint,

27

are sufficiently related.  The predicate acts alleged in Plaintiff's complaint involve Plaintiff as

the victim of those acts, share the common purpose of fraudulently denying Plaintiff's workers'

compensation benefits, and contribute to the execution of that common purpose.  *See H.J. Inc.,*

492 U.S. at 240 (outlining such factors as whether the predicate acts have the same or similar

victims, purposes, or results).  When considering principles of aider-and-abetter liability, the

predicate acts entail the same participants.  *See H.J. Inc.,* 492 U.S. at 240 (outlining this as a

factor in the relatedness determination).  Moreover, several of the predicate acts that Plaintiff's

complaint alleges involve mail fraud and, thus, entail the same method of commission. *See id.*

(outlining this as a factor in the relatedness determination).  As Plaintiff's complaint makes clear,

the alleged predicate acts are not "isolated events" but, rather, are "interrelated by distinguishing

characteristics."  *Id.* (internal quotation marks omitted).

Rather, the principal issue here is whether the alleged predicate acts amount to, or

threaten the likelihood of, continuing racketeering activity.  *See H.J. Inc.,* 492 U.S. at 239-240.

In *H.J.*, the Court explained that element as comprising "both a closed- and open-ended concept,

referring either to a closed period of repeated conduct, or to past conduct that by its nature

projects into the future with a threat of repetition."  *Id.* at 241 (noting that "[i]t is, in either case,

centrally a temporal concept").  According to the Court, "[a] party alleging a RICO violation

may demonstrate continuity over a closed period by proving a series of related predicates

extending over a substantial period of time."  *Id.* at 242 (holding that "[p]redicate acts extending

over a few weeks or months and threatening no future criminal conduct" are insufficient).  The

Court further held that a party alleging a RICO violation may also demonstrate the requisite

continuity by proving that the predicate acts give rise to a threat of continuing racketeering

activity; as the Court noted, RICO plaintiffs often attempt to establish continuity in this manner since they typically must bring the action before the substantial period of time in which to demonstrate a closed-period of continuity has occurred.  *Id.* (holding that such a determination is fact-specific).

In *Columbia Natural Resources, Inc. v. Tatum,* the Sixth Circuit held, presumably as to the element of continuity,[14] that a court should consider various factors, such as: 1) "the length of time [that] the racketeering activity existed [the longer the better]"; 2) "the number of different schemes (the more the better)"; 3) "the number of predicate acts within each scheme (the more the better)"; 4) "the variety of species of predicate acts (the more the better)"; 5) "the distinct types of injury (the more the better)"; 6) "the number of victims (the more the better)"; and 7) "the number of perpetrators (the less the better)."  58 F.3d 1101, 1110 (6th Cir. 1995). Illustrating the applicability of these factors, the Sixth Circuit noted that, "at one extreme is a perpetrator committing two predicate acts, in one day, in one scheme, causing a single injury, to a single victim," which circumstances do not demonstrate the requisite "pattern of racketeering activity," and, "[a]t the other extreme, [is] a perpetrator engineering dozens of schemes, and using myriad predicate acts to further each scheme, against numerous victims causing numerous injuries," which circumstances demonstrate the required pattern.[15]  *Id.*

_____

[14]While the Sixth Circuit referred to those factors as being relevant to a determination of whether the requisite "pattern of racketeering activity" exists under the RICO Act, it also affirmed that the requisite pattern comprises two distinct elements: 1) relatedness of the predicate acts; and 2) continuity of predicate acts.  *Columbia Natural Resources, Inc. v. Tatum,* 58 F.3d 1101, 1110 (6th Cir. 1995)*; Fleischhauer,  v. Feltner*, 879 F.2d 1290, 1297 (6th Cir. 1989).  Because the enumerated factors do not compare the nature of the predicate acts, as the relatedness element requires, presumably, the factors bear upon the continuity element.

[15]Providing, of course, that the predicate acts are related.

To sufficiently plead closed-period continuity, Plaintiff's complaint must plead "a series of related predicates extending over a substantial period of time." *H.J. Inc.,* 492 U.S. at 242. Here, Plaintiff contends that the predicate acts that his complaint pleads "occur[] over two years." (Resp. to Harrison at 7.)  However, the time between the first predicate act that is alleged, July 24, 2003, (Compl. at ¶ 9(c)), and the last predicate act that is alleged, April 16, 2004, (Compl. at ¶ 10.), spans less than 9 months.  Such a period of time is not sufficiently "substantial" to demonstrate closed-period continuity.[16]  *See H.J. Inc.,* 492 U.S. at 242 (holding that "[p]redicate acts extending over a few weeks or months and threatening no future criminal conduct" are insufficient).

---

[16]As the district court in *General Motors Corp. v. Ignacio Lopez de Arriortua,* 948 F. Supp. 670 (E.D. Mich. 1996), summarized:

> Courts have not adopted a bright line test of what period of time constitutes a minimum duration for a close-ended scheme.  Under some circumstances, schemes lasting as long as eighteen months have been found insufficient to support a RICO claim.  *See, e.g., Vemco, Inc. v. Camardella,* 23 F.3d 129 (6th Cir. 1994) (holding [that] racketeering activity over [a] seventeen month period did not satisfy continuity requirement under RICO because complaint alleged single criminal episode where defendant committed crimes to get one plaintiff to pay for one paint system) . . . ; *Gotham Print, Inc. v. American Speedy Printing Centers, Inc.,* 863 F. Supp. 447 (E.D. Mich. 1994) (holding [that] isolated acts of mail and wire fraud over [an] 18 month period did not satisfy pattern element of RICO). Under other circumstances, shorter schemes have been found sufficient to support a RICO allegation.  *See, e.g., Gould, Inc. v. Mitsui Mining & Smelting Co., Ltd.,* 750 F. Supp. 838 (N.D. Ohio 1990) (where [the] plaintiff brought RICO claim against two companies that allegedly received stolen trade secrets from plaintiff's former employee, court held thirteen months of predicates acts were sufficient to establish continuity).

Plaintiff contends that, in *General Motors Corporation,* the district court declined to dismiss a RICO case involving a single scheme of theft from one victim spanning a time period that is much less than that here. (Resp. to Harrison at 8.)  However, in *General Motors Corporation,* the relevant time period was sixteen months, as compared to the nine months at issue here.

30

To demonstrate open-ended continuity, in the alternative, the plaintiff must show that the predicate acts give rise to a threat of continuing racketeering activity. *Id.* The Court will consider, in turn, each of the factors that *Columbia Natural Resources, Inc.,* sets out. As to the number of different schemes, Ray contends that, at the most, the pleadings show the existence of a single scheme to deny Plaintiff's workers' compensation benefits. (Ray Mot. at 8.) In *H.J.,* the Supreme Court aptly observed that the number of "schemes" depends upon the level of generality with which one views the alleged criminal activity, and, in illustrating the principle behind this observation, noted that one may view each fraudulent decision in pursuit of a single fraudulent objective as a distinct scheme. 492 U.S. at 241 n.3. In this case, therefore, while the alleged over-all fraudulent objective was to deny Plaintiff's workers' compensation benefits, each alleged predicate act to accomplish this aim could be viewed as a scheme within that greater scheme, especially where those predicates acts were punctuated by the termination of Plaintiff's benefits, a reinstatement of those benefits, and then another termination of those benefits. In any event, even if Plaintiff's complaint alleged only a single scheme, the Supreme Court noted in *H.J. Inc.* that, while evidence of multiple criminal schemes would be highly relevant to the continuity element, predicate acts may form the requisite pattern even if they fall within a single scheme. 492 U.S. at 236, 240; *see Fleischhauer,* 879 F.2d at 1298 (finding a "pattern of racketeering activity" where each defendant committed predicate acts of fraud, there were 19 victims of that fraud, and there was only a single scheme).

Regarding the number of predicate acts within each scheme, Plaintiff's complaint, arguably, alleges seven predicate acts within the greater scheme of terminating Plaintiff's workers' compensation benefits. As to the length of time that the racketeering activity existed, it

lasted not even 9 months.  Concerning the "variety of species of predicate acts," Plaintiff's complaint alleges five predicate acts of mail fraud, one predicate act of mail and/or wire fraud, and one predicate act of witness tampering.  Regarding "the distinct types of injury," Harrison aptly notes that Plaintiff's alleged injuries stem from Defendants' denial of Plaintiff's workers' compensation benefits. (Harrison Br. at 7.)  As to "the number of victims," Plaintiff is the only alleged victim.[17]  (Harrison Br. at 7.)  Lastly, concerning "the number of perpetrators," Plaintiff's complaint alleges only 4: Harrison, the Service, the Fund, and Ray.  The Court finds that these factors, on balance, counsel against finding an open-ended threat of racketeering activity.

Of special note, Plaintiff claims that his complaint sufficiently pleads the requisite threat of continuity in that it demonstrates "the likelihood that . . . [the predicate acts] will continue for many more years because [P]laintiff is permanently disabled and remains subject to [D]efendants' scheme of payment/cut-off/payment/cut-off."  (Resp. to Harrison at 7.)  However, Defendants' actions undermine Plaintiffs' claim of continuity; Defendants have submitted to the WDCB to resolve, once and for all, the issue of Plaintiff's entitlement to workers' compensation benefits rather than agreeing to pay those benefits voluntarily.

The Court concludes that, even if Plaintiff's complaint sufficiently plead at least two predicate acts, that complaint would, nevertheless, fail to allege that those acts amount to, or threaten the likelihood of, continuing racketeering activity so as to plead a "pattern of

---

[17]*See Blue Cross and Blue Shield of Michigan v. Kamin,* 876 F.2d 543 (6th Cir. 1989)(observing that a defendant cannot insulate himself from civil RICO liability simply by repeatedly bilking the same victim, and holding that insurer sufficiently alleged continuity necessary to state RICO claim against chiropractor in connection with the submission of false treatment claims even though insurer was sole victim where each false claim involved a separate and distinct insured and at least one mailing, and there were two different schemes involving different types of false claims).

racketeering activity," as § 1962(c) requires.  Based upon this alternative ground, the Court

DISMISSES Plaintiff's RICO claims for failure to state claims for which relief may be granted.

### c.  Commerce Requirement

As the Sixth Circuit had held, "for purposes of § 1962(c), the criminal enterprise need

only have a minimal impact upon interstate commerce."  *United States v. Robinson*, 763 F.2d

778 (6th Cir. 1985).  "Moreover, only the criminal enterprise itself or the racketeering activities

associated with the enterprise, not the conduct of each individual defendant, must affect

interstate commerce."  *Allen v. United States*, No. 01-1027, 2002 WL 2026279 at * 3 (6th Cir.

2002) (unpublished opinion).

The Fund, in its motion to dismiss, argues that Plaintiff's complaint fails to plead that the

alleged enterprise affected interstate or foreign commerce, an element of a claim under 18 U.S.C.

§ 1962(c).  (Fund Br. at 8)  Plaintiff, in turn, points to paragraph 16 of his complaint, which

alleges that "Defendants used the Postal Service and the wires for interstate communications in

effectuation of their scheme. . . ."  (Resp. to Fund at 7.)  In reply, the Fund questions how the

complaint's allegations of mailings from Farmington Hills, Michigan, to Taylor, Michigan,

Warren, Michigan, and to Southfield, Michigan, plead an affect on interstate commerce.  (Fund

Reply at 3.)

In the event that his complaint fails to plead RICO's interstate-commerce element

adequately, Plaintiff seeks the Court's leave to file an amended complaint adding the following

allegation:

> Defendants' enterprise affected interstate commerce and the movement of goods,
> services, and people in interstate commerce, in that (1) Harrison Piping operates
> in both Michigan and Ohio and owns a place of business in Ohio, and (2) the
> Fund must pay benefits to claimants wherever they live in the United States, and

to Ohio residents if they are injured in Michigan as well as to Michigan residents if they are injured in Ohio.

(Resp. to Fund at 7.)  However, because Plaintiff's RICO claims do not survive the instant motions to dismiss, any such amendment would be futile.  *See Foman v. Davis,* 371 U.S. 178, 182 (1962).

### d.  Enterprise Requirement

For purposes of a claim under 18 U.S.C. § 1962(c), a plaintiff "must allege and prove the existence of two distinct entities: (1) a 'person'; and (2) an 'enterprise' that is not simply the same 'person' referred to by a different name. *Cedric Kushner Promotions, Ltd. v. King,* 533 U.S. 158, 162 (2001). 18 U.S.C. § 1961(3) defines "person" to include "any individual or entity capable of holding a legal or beneficial interest in property."  18 U.S.C. § 1961(4) defines "enterprise" to include "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."  *See Frank v. D'Ambrosi,* 4 F.2d 1378, 1386 (6th Cir. 1993) (holding that, to constitute an "enterprise," "an association-in-fact must be an ongoing organization, its members must function as a continuing unit, and it must be separate from the pattern of racketeering activity in which it engages"). In sum, "one or more of the [d]efendants must be the single 'person' who acts upon the enterprise in such a way that the enterprise's affairs are conducted in the pattern of racketeering."  *Ross v. Omnibusch, Inc.*, 607 F. Supp. 835, 838 (W.D. Mich. 1984); *see also Bennett v. Berg*, 685 F.2d 1053, 1060 (8th Cir. 1982).  The pleadings must sufficiently describe the distinction between the separate "person" and the separate "enterprise."  *Fleishhauer v. Feltner,* 879 F.2d 1290, 1296-97 (6th Cir. 1989).

Only "persons" may be liable for a violation of § 1962(c), not the "enterprise" itself.  *Id.*

at 1296.  Moreover, liability under § 1962(c) hinges upon a "showing that the defendants conducted or participated in the conduct of the '*enterprise's* affairs, not just their *own* affairs." *Reves v. Ernst Young,* 507 U.S. 170, 185 (1993)) (emphasis in original).

Defendants maintain that Plaintiff's complaint fails to plead the existence of a distinct "person" and a distinct "enterprise" so as to sustain his § 1962(c) claim.  (Service Br. at 8-9.) First, Defendants assert that Plaintiff's complaint simply alleges that Defendants constitute the "enterprise."  (*Id.* at 10.)  As Defendants note, paragraph 5 of the complaint alleges that "Defendants formed an 'enterprise' for purpose of" RICO, and paragraph 15 alleges that "Defendant's Workers Compensation officials formed an 'enterprise' within the meaning of the RICO Act."  (*Id.* at 9.)  According to Defendants, Plaintiff's complaint fails to allege the existence of any "person." (*Id.* at 10.)

Plaintiff, in response, argues that his complaint, per paragraphs 5, 13, and 15, properly pleads the existence of an "enterprise" distinct from each "person" constituting that "enterprise." (Resp. to Service at 5-6.)  Those paragraphs allege, in part:

> . . . Defendants formed an enterprise for purposes of the Racketeer Influenced and Corrupt Organizations Act (RICO) . . . .
>
> At all times and in all actions plead in this complaint, [D]efendants acted in concert with each other.  Decisions regarding paying claims or terminating payment were made jointly by the corporate [D]efendants, or were made by the Service Company or the Association after consulting with Harrison, or were ratified by Harrison after being made by the Association or the Service Company . . . .
>
> Defendants' workers compensation officials formed an 'enterprise' within the meaning of the RICO Act.  The members of the enterprise engaged, in this case, in the pattern of racketeering described above in para[graph] 9.  Dr. Ray became part of the enterprise by his actions, described above.  On information and belief, one or more members of the enterprise engaged in similar acts to defraud other persons of their workers compensation benefits.

(Compl. at ¶¶  5, 13, 15.)

Defendants, in reply, maintain that, as evident in the above-referenced paragraphs, Plaintiff's complaint alleges that the "enterprise" itself conducted the racketeering activity, and fails to allege that any "person" conducted such activity through the conduct of the enterprise's affairs. (Service Reply at 5.)

The Sixth Circuit noted, in *Begala v. PNC Bank, Ohio*, 214 F.3d 776, 782 (6th Cir. 2000), that "the complaint must contain facts suggesting that the behavior of the listed entities is 'coordinated' in such a way that they function as a 'continuing unit.'"

Drawing all reasonable inferences from its allegations in Plaintiff's favor, the Court concludes that the complaint sufficiently alleges an "enterprise" as distinct from a "person." Although Plaintiff's complaint fails to expressly denominate each Defendant as a "person," it can be reasonably read to do so implicitly.  While paragraph 15 alleges that "Defendants' workers compensation officials formed an 'enterprise'" along with Dr. Ray, it also alleges that "[t]he members of the enterprise engaged . . . in the pattern of racketeering described . . . in para[graph] 9."  Thus, contrary to Defendants' contention, Plaintiff's complaint alleges that the "members of the enterprise," rather than the enterprise itself, engaged in the racketeering activity.  Because the "members of the enterprise" are engaging in the racketeering activity, one could reasonably infer that they are the requisite "persons."  Moreover, because 18 U.S.C. § 1961(3) defines "person" singularly, rather than collectively, one could reasonably assume that each Defendant constitutes a distinct "person."  Indeed, paragraph 6 of Plaintiff's complaint alleges that "[o]ne or more of these persons [Defendants] committed . . . mail fraud, wire fraud,

36

and/or conspiracy to defraud, in a repeated and continuing pattern, by fraudulently denying benefits." Thus, drawing all justifiable inferences from Plaintiff's complaint in Plaintiff's favor, the Court finds that Plaintiff's complaint pleads each Defendant as constituting a "person" and the Defendants collectively, or all of the Defendants, as constituting the "enterprise." *See United States v. Console*, 13 F.3d 641, 653-54 (3d Cir. 1993).

Defendants next argue that, even if Plaintiff's complaint were to have pleaded one of the Defendants as the requisite "person," it would, nevertheless, fail to plead a "person" as distinct from the alleged "enterprise." (Service Br. at 10.) According to Defendants, Defendants cannot be both the "person" and the "enterprise." (Service Br. at 10.) However, in *Fleischhauer v. Feltner*, the Sixth Circuit held that pleadings that alleged that "each of the five defendants was a 'person' and together they formed a racketeering 'enterprise'" properly plead a distinct "person" and "enterprise." 879 F.2d at 1296-97. This is so because the relevant comparison is between each "person" in the singular–here, each Defendant–and the "enterprise"–here, all of the Defendants–rather than between all of the "persons" and the "enterprise."

Defendants also contend that Plaintiff's complaint fails to allege that members of the enterprise engaged in racketeering activity as part of the enterprise's affairs, rather than as part of their own affairs. (Service Br. at 10.) However, as Plaintiff asserts, his complaint, per paragraphs 5, 13, and 15, as recited-above, pleads sufficiently that each "person" or individual Defendant participated in the conduct of the enterprise's affairs, rather than in merely his or its own individual affairs. (Resp. to Service at 6.) This is especially so where other portions of his complaint plead "a scheme by [D]efendants to fraudulently deprive [P]laintiff of his workers' compensation benefits." (Compl. at ¶ 9(f))

### 4.  McCarran-Ferguson Preemption

Harrison argues that, under the McCarran-Ferguson Act, 15 U.S.C. § 1012(b),  the

WDCA, M.C.L. 418.1101, *et seq*., reverse-preempts Plaintiff's RICO claims.  (Harrison Br. at

11.)  Plaintiff contends otherwise. (Resp. to Harrison at 11.)

The McCarran-Ferguson Act, 15 U.S.C. § 1012(b), provides:

No act of Congress shall be construed to invalidate, impair, or supersede any law
enacted by any State for the purpose of regulating the business of insurance . . .
unless such acts specifically relate to the business of insurance.

The purpose behind the McCarran-Ferguson Act is to establish "a form of inverse preemption,

letting state law prevail over general federal rules–those that do not 'specifically relate to the

business of insurance.'"  *Nationwide Mutual Ins. Co. v. Cisneros,* 52 F.3d 1351, 1360 (6th Cir.

1995) (internal quotation marks omitted).  However, under the Act, "when Congress enacts a law

specifically relating to the business of insurance, that law controls."  *Humana Inc. v. Forsyth*,

525 U.S. 299, 306 (1999). To recap, the McCarran-Ferguson Act precludes the application of a

federal statute: 1) that does not "specifically relate to the business of insurance"; 2) in the face of

state law "enacted . . . for the purpose of regulating the business of insurance"; and 3) where the

federal statute would "invalidate, impair, or supersede" the state insurance law.  *Id.* at 307.

As to the first prerequisite, the RICO Act is not a federal statute that "specifically

relate[s] to the business of insurance."  *Humana*, 525 U.S. at 307.  Thus, the first prerequisite to

reverse-preemption under the Act is met here.

Concerning the second prerequisite, a state law is "enacted . . . for the purpose of

regulating the business of insurance" where:  1) it has the "effect of transferring or spreading the

policyholder's risk"; 2) it is an "integral part of [the] policy relationships between [the] insurer

38

and [the] insured"; and 3) it is "limited to entities within the insurance industry." *Medical Mut. of Ohio v. DeSoto*, 245 F.3d 561, 574 (6th Cir. 2001). The Court recognizes that whether Michigan enacted the WDCA "for the purpose of regulating the business of insurance" is, indeed, a thorny issue. The Court concludes, however, that the WDCA does, in fact, regulate the business of insurance.

First, the Court agrees with Harrison that the WDCA transfers or spreads a risk that is characteristic of insurance. *See Union Labor Life Ins. Co. v. Pireno,* 458 U.S. 119 (1982). (Harrison Br. at 12.) As the Michigan Supreme Court has opined, "[t]he primary purpose of the . . . [WDCA] is to provide benefits to the victims of work-related injuries by allocating the burden [of] these payments to the employer and, therefore, ultimately, to consumers." *Simkins,* 453 Mich. at 710.

Second, the Court agrees with Harrison that the WDCA is an "integral part of [the] policy relationships between [the] insurer and [the] insured." *DeSoto*, 245 F.3d at 574. (Harrison Br. at 12.) The WDCA requires all Michigan employers to provide workers' compensation benefits to their employees, either by self-insuring or by purchasing insurance from a duly-authorized insurance company. If one were to define the employee as the insured and the self-insured employer as the insurer, then the WDCA would, indeed, be an integral part of the policy relationship between the employee and employer, so defined. If one were to define the non-self-insured employer and the employer's insurer or the employee and the employer's insurer as the insured and insurer, respectively, then the WDCA would still be an integral part of the policy relationship between those entities and individuals in that the employer and its insurer have, in essence, contractually agreed to have the insurer fulfill the employer's obligations to its

employees under the WDCA.

Lastly, the Court concludes that the WDCA is "limited to entities within the insurance industry." Plaintiff, in essence, maintains that the WDCA is not limited to such entities because it reaches employers who are not self-insured, like Harrison, and, thus, is not limited to insurance companies.[18] (Resp. to Harrison at 11.) Yet, the WDCA does not include entities outside of the insurance industry simply because it reaches employees, whom one could characterize as either the insured or the beneficiaries of the insurance. Similarly, the WDCA does not include entities outside of the insurance industry simply because it reaches employers who elect to purchase insurance from an insurance company rather than to self-insure, which employers one could, then, characterize as the insured.[19] Furthermore, adjusters of insurance claims, like the Service, are entities within the insurance industry. *See Pireno,* 458 U.S. at 134 n.8.

The Court notes that the Michigan Legislature did not expressly associate the WDCA with the regulation of insurance. *See Biondo v. Life Ins. Co. of North Am.,* 116 F.Supp.2d 872, 883 (E.D. Mich. 2000). Rather, as Plaintiff aptly notes, Michigan Complied Laws place the WDCA in Chapter 418 dealing with labor rather than in Chapter 500 in the Insurance Code, and the Michigan's Department of Consumer and Industry Services, rather than the Michigan Insurance Bureau, regulates and has jurisdiction over the WDCA's administrative scheme.

---

[18]Plaintiff also underscores that Ray is simply a medical doctor and, thus, is not an individual within the insurance industry. (Resp. to Harrison at 11.) However, the relevant inquiry under *Humana* is whether the state-law at issue regulates the business of insurance, not whether each particular defendant is involved in the business of insurance.

[19]Moreover, by electing to self-insure its obligation to provide workers' compensation benefits to its employees, pursuant to the WDCA's strict requirements, the employer, in effect, stands in the stead of an insurance company.

40

(Resp. to Harrison at 13, n.4.)  However, the Court finds that this consideration, while relevant, is insufficient in itself to compel a finding that the WDCA does not regulate the business of insurance.  Similarly, as Harrison points out, Plaintiff's attempt to characterize the provision of workers' compensation benefits as not comprising insurance is unpersuasive.  (Resp. to Harrison at 12; Harrison Reply at 3.) Rather, the term "insurance" denotes "[a] contract whereby, for a stipulated consideration, one party undertakes to compensate the other for loss on a specified subject by specified perils."  Black's Law Dictionary 802 (6th Ed. 1990).  The WDCA simply deprives the parties of their freedom of contract and, instead, imposes the benefits and burdens of the predetermined bargain upon them.  The scope of that bargain–to "compensate . . . for the loss on a specified subject by specified perils" or to compensate for work-related injuries here–remains unchanged.

As to the last prerequisite, the Supreme Court held, in *Humana Inc. v. Forsyth* that, when the federal statute does not "directly conflict" with the state law and "when application of the federal law would not frustrate any declared state policy or interfere with a [s]tate's administrative regime," the federal law does not "invalidate, impair, or supersede" the state law. 525 U.S. at 310.  According to the Supreme Court, the term "invalidate" denotes "to render ineffective, generally without providing a replacement rule or law," and the term "supersede" denotes "to displace (and thus render ineffective) while providing a substitute rule."  *Id.* at 308 (internal quotation marks omitted) (finding that the RICO Act would neither invalidate nor supersede Nevada insurance-fraud law).

As Plaintiff aptly notes, the RICO Act and the WDCA do not directly conflict.  (Resp. to Harrison at 12.)  Rather, one could comply with both the RICO Act and the WDCA.  Moreover,

the termination of workers' compensation benefits to which the employee is entitled would be actionable under the WDCA and, where part of a fraudulent RICO enterprise, would be actionable under the RICO Act as well.  In other words, the RICO Act would not proscribe conduct–i.e. the termination of workers' compensation benefits to which the employee is entitled–that the WDCA would permit or prescribe.  Consequently, the application of the RICO Act in this case would neither "render ineffective " nor "displace" the WDCA or any claim under that Act. Thus, applying the RICO Act here would neither invalidate nor supersede the WDCA.

Rather, at issue is whether applying the RICO Act to this case would "impair" the WDCA.  The Supreme Court held that the term "impair" denotes "[t]o weaken, to make worse, to lessen in power, diminish, or relax, or otherwise affect in an injurious manner." *Humana,* 525 U.S. at 309-10 (internal quotation marks omitted).  Moreover, as the Court noted, a federal law "impairs" a state law where it "frustate[s] any declared state policy or interfere[s] with a [s]tate's administrative regime." *Id.* at 310.

The RICO Act, in affording treble damages and a private right of action, provides Plaintiff greater recourse than that which the WDCA provides.  In *Humana,* the Supreme Court addressed the issue of whether the RICO Act impairs Nevada insurance-law by providing materially-different remedies than that state law for purposes of the McCarran-Ferguson Act. 525 U.S. at 305.  The court held that, although the RICO Act authorizes treble damages while Nevada's insurance-fraud law permits recovery of only compensatory and punitive damages, applying the RICO Act in that case would not impair the state law but, rather, would complement its remedial scheme.  *Id.* at 313.  Specifically, the Court noted that, based upon Nevada law's bad-faith exception to its punitive-damages cap, a plaintiff may be eligible under

state law for damages exceeding those under the RICO Act. *Id.* at 313.

Here, Plaintiff would not be eligible to receive damages equal to or exceeding those available under the RICO Act by virtue of an exception to the exclusive remedies that the WDCA provides. *See* M.C.L.A. 418.131. As discussed below, Plaintiff's claims of intentional infliction of emotional distress surrounding Defendants' alleged fraudulent denial of Plaintiff's workers' compensation benefits under Michigan law fail to state claims for which relief may be granted.

As the Court previously noted, the purpose of the WDCA previously "is to provide . . . not only for employees a remedy which is both expeditious and independent of proof of fault, but also for employers a liability which is limited and determinate." *Simkins,* 453 Mich. at 710. Thus, applying the RICO Act here to Plaintiff's claims that Defendants fraudulently denied Plaintiff's workers' compensation benefits so as to render Plaintiff eligible for damages beyond which the WDCA permits would turn on its head the policy balance that the Michigan legislature struck in the WDCA. Indeed, employees would still receive the speedy and no-fault recovery of guaranteed compensation for work-related injuries under the WDCA, thereby reaping their respective benefits from that legislative balance. However, imposing liability under the RICO Act upon employers beyond that which the WDCA permits robs those employers of the benefits that they are to receive from the WDCA's policy balance.[20] To impose liability under the RICO Act upon employers' insurers of workers' compensation benefits or the claims' adjusters of those

---

[20]Plaintiff asserts that applying the RICO Act would encourage employers to pay valid claims rather than to deny them fraudulently and, thus, would promote the WDCA's aim of ensuring employees' quick recovery of benefits. (Resp. to Harrison at 13.) However, this argument ignores the other half of the bargain that the WDCA struck.

43

insurers, rather than the employers themselves, would still undermine the WDCA's policy

balance in that any such liability would ultimately be passed on to the employers in the form of

higher premiums.  The Court finds that applying the RICO Act here would impair the WDCA. [21]

Thus, the Court concludes that the WDCA reverse-preempts Plaintiff's RICO claims

pursuant to the McCarran-Ferguson Act, 15 U.S.C. § 1012(b).  The Court, therefore,

DISMISSES Plaintiff's RICO claims on this alternate ground.

### 5. LMRA Preemption

The Labor Management Relations Act of 1947 ("LMRA") or § 301(a), 29 U.S.C. § 141

---

[21]Harrison argues that applying the RICO Act here would impair the WDCA's policy of permitting employers to make "voluntary" payments of workers' compensation benefits by chilling employers' exercise of that statutory right. (Harrison Br. at 12-13.)  Presumably, Harrison is arguing that employers would be reluctant to settle claims for workers' compensation benefits under the WDCA if such settlement were to compromise defenses that they have in any RICO litigation surrounding those benefits.  While this contention seems persuasive at first blush, the WDCA, M.C.L.A. 418.831, expressly provides that "[n]either the payment of compensation nor the accepting of the same by the employee or his dependents shall be considered as a determination of the rights of the parties under this act."  Thus, a "[v]oluntary payment of compensation is not an admission of liability."  *Gilbert v. Reynolds Metals Co.,* 228 N.W.2d 542, 545 (Mich. Ct. App. 1975).

Ray argues, in essence, that applying the RICO Act here would impair the WDCA's policy of permitting employers to conduct independent medical examinations for purposes of diagnosing a work-related disability because subjecting the medical practitioners who conduct those examinations to civil RICO liability would discourage medical practitioners to conduct such exams in the first instance and, thus, would undermine the employers' ability to secure such examinations. (Ray Mot. at 12.)  Yet, medical practitioners conducting such independent medical examinations would only be subject to civil RICO liability if the examinations were fraudulent, and imposing RICO liability in such a situation would simply discourage fraud-prone medical practitioners from conducting independent medical examinations in their entirety or medical practitioners from conducting such examinations in a fraudulent manner.  Moreover, the WDCA, M.C.L.A. 418.315, itself provides that "[a] health facility or health care provider that submits false or misleading records or other information to a carrier or the bureau is guilty of a misdemeanor. . . ."  Thus, contrary to Ray's contention, subjecting the medical practitioners who conduct fraudulent medical examinations to RICO liability would be consistent with the WDCA's expressed policy of rendering such individuals liable.

*et seq.*, governs the interpretation of collective bargaining agreements ("CBAs"). Section 301,

which provides a federal cause of action for a breach of a CBA, states in part:

> Suits for violation of contracts between an employer and a labor organization
> representing employees in an industry affecting commerce . . . may be brought in
> any district court of the United States having jurisdiction of the parties, without
> respect to the amount in controversy or without regard to the citizenship of the
> parties.

29 U.S.C. § 185(a). "[S]ection 301 not only confers federal jurisdiction over controversies

involving . . . [CBAs], but also authorizes the federal courts to fashion a body of federal law for

the enforcement of section 301." *Terwilliger v. Greyhound Lines, Inc.,* 882 F.2d 1033, 1036 (6th

Cir. 1989). Moreover, to develop a uniform body of national labor law and "to avoid conflicts in

the interpretation of collective bargaining agreements," the federal law governing § 301

preempts state law. *Id.* Pursuant to this preemption doctrine, § 301 governs claims that directly

rely upon rights that arise from CBAs and claims that substantially hinge upon the analysis or

interpretation of collective bargaining agreements. *Id.*

"[F]ederal labor policy requires that individual employees wishing to assert [labor]

contract grievances must *attempt* use of the contract grievance procedure agreed upon by the

employer and the union as the mode of redress." *Id.* at 1039 (internal quotation marks omitted;

emphasis in the original). Additionally, unless the employee utilizes the contractual procedures

for settling his labor-contract dispute, his independent suit in district court based upon that

dispute must be dismissed. *Id.* (internal quotation marks omitted).

In its motion to dismiss, Harrison argues that the LMRA preempts Plaintiff's RICO

claims. Relying upon exhibits attached to its pleadings, Harrison contends that Plaintiff, as a

warehouseman/driver for Harrison, was covered by a Collective Bargaining Agreement Local

247 of the International Brotherhood of Teamsters ("the CBA").  (Harrison Br. at 1.)  According
to Harrison, Plaintiff's RICO claims based upon Defendants' alleged fraudulent denial of
Plaintiff's workers' compensation benefits, in essence, allege a violation of the CBA such that
the CBA's grievance and arbitration provisions govern those claims.  (*Id.* at 16-17, 21.)
Harrison asserts, however, that, because Plaintiff never filed a grievance regarding Defendants'
alleged wrongful denial of his workers' compensation benefits, the Court must dismiss Plaintiff's
RICO claims. (*Id.* at 17-18.)

       As an initial matter,  "[t]he use of the term 'preemption' in this setting . . . has a dissonant
ring to it."  *Trollinger v. Tyson foods, Inc.,* 370 F.3d 602, 608, 611 (6th Cir. 2004).  Making such
an observation, the United States Sixth Circuit Court of Appeals opined:

> To say that federal courts . . . [may not] hear a claim under one federal act (RICO)
> because it is 'preempted' by another federal act . . . is not a natural use of the term
> 'preemption.'  As federal courts generally use the term, preemption does not
> describe the effect of one federal law upon another; it refers to the supremacy of
> federal law over state law when Congress, acting within its enumerated powers,
> intends one to displace the other.

*Trollinger v. Tyson foods, Inc.,* 370 F.3d 602, 608, 611 (6th Cir. 2004) (internal quotation marks
omitted).  The Court further observed that a "cardinal principal of statutory construction" is that,
"[w]hen there are two [federal] acts upon the same subject, the rule is to give effect to both."  *Id.*
(internal quotation marks omitted).  According to the Court, "[a]bsent an intolerable conflict
between the two statutes," courts are unwilling to construe the subsequent federal act as
repealing any portion of the former federal act.  *Id.* (internal quotation marks omitted).

       In any event, Harrison relies upon materials that transcend the pleadings to support its
contention that § 301 of the LMRA preempts Plaintiff's RICO claims.  Having already
concluded that Plaintiff's RICO claims fail as a matter of law, the Court declines, in its

                                                 46

discretion, to treat the instant motion to dismiss under that rule as a motion for summary

judgment pursuant to Rule 56 for purposes of adjudicating Harrison's contention that § 301

preemption affords another ground for summary dismissal of Plaintiff's RICO claims.

### B.  State-law Claims

Plaintiff's complaint alleges that each Defendant intentionally inflicted emotional distress

upon Plaintiff in violation of Michigan law ("IIED claims").  (1st Am. Compl. at ¶¶ 17-19.)

Having dismissed all claims over which the Court has original jurisdiction, the Court

would normally decline to exercise pendent jurisdiction, under 28 U.S.C. § 1367, over Plaintiff's

IIED claims.  *See Hankins v. The Gap, Inc.,* 84 F.3d 797 (6th Cir. 1996).  However, because the

resolution of Plaintiff's IIED claims is necessary to the Court's determination of whether the

WDCA reverse-preempts Plaintiff's RICO claims under the McCarran-Ferguson Act, as

addressed above, the Court will exercise pendent jurisdiction over Plaintiff's IIED claims.

Harrison maintains that Plaintiff's IIED claims fail to state claims for which relief may be

granted.  (Harrison Br. at 16.)  While the Michigan Supreme court has yet to recognize formally

the tort of IIED, it has described the elements that would be necessary to establish those claims.

*Roberts v. Auto Owners Ins. Co.,* 422 Mich. 594, 697, 603 (Mich. 1985).  Specifically, a plaintiff

would have to demonstrate: 1) extreme and outrageous conduct; 2) intent or recklessness; 3)

causation; and 4) severe emotional distress.  *Roberts,* 422 Mich. at 602.  As to the requisite

extreme and outrageous conduct, the Court has adopted the following standards that

Restatement, Torts, 2d § 46, Commend D, sets forth:

> . . . [T]he conduct . . . [must be] so outrageous in character, and so extreme in
> degree, as to go beyond all possible bounds of decency, and to be regarded as
> atrocious and utterly intolerable in a civilized community.  Generally, the case is
> one in which the recitation of the facts to an average member of the community

would arose his resentment against the actor, leaving him to exclaim,
'outrageous.'

*Id.* at 603.

Plaintiff, in response, asserts that his IIED claims rest upon Defendants' alleged
fraudulent denial of Plaintiff's workers' compensation benefits, rather than a mere wrongful
denial of those benefits.  (Resp. to Harrison at 16.)  Plaintiff further contends that, under *Broadus
v. Ferndale Fastener Div.,* 84 Mich. App. 593 (1978) and *Atkinson v. Farley,* 171 Mich. App.
784 (1988), his IIED claims state claims for which relief may be granted. (1ˢᵗ Am. Compl. at ¶
17; Resp. to Harrison at 16.)  In *Atkinson,* the Michigan Court of Appeals held that "[a]n
insurer's wrongful, bad faith termination of benefits, by itself, is not sufficiently outrageous to
support a claim for intentional infliction of emotional distress."  171 Mich. App. at 790.  The
Court held, however, that the plaintiff's complaint alleged an IIED claim for which relief could
be granted because it alleged the following:

> . . . [Defendants were in a position of control over [the] plaintiff's sole source of
> income, and knew that [the] plaintiff was extremely dependent upon the receipt of
> his [workers' compensation] disability benefits, yet abused their position by
> interfering with plaintiff's benefits, by ignoring the requirement to deal with his
> attorney, by threatening to cut off . . . [his] benefits, and by demanding that . . .
> [he] repay them a large sum of money. . . . [D]efendants were abusing their
> control of [the] plaintiff's income . . . to harass and intimidate him to gain
> economic benefit for the insurance company.

*Id.* at 791.

In *Broadus,* the Michigan Court of Appeals held that the WDCA's exclusive-remedy
provision does not bar an action for the intentional infliction of emotional distress surrounding
the defendants' alleged collusion in denying workers' compensation benefits where the essence
of the tort and the damage alleged is non-physical, such as emotional and mental distress

48

damages.  84 Mich. App. at 597, 600, 600 n.4 (holding that the plaintiffs were not seeking as

damages compensation for workers' compensation benefits, and noting that the defendants, on

remand, are still free to challenge particular damage claims on the ground that the WDCA

renders them compensable so as to bar them under its exclusive-remedy provision).  As the

Court of Appeals later clarified, *Broadus* never held that the failure to pay workers'

compensation benefits based upon the facts there enabled the plaintiff to recover on his IIED

claim.  *Lisecki v. Taco Bell Restaurants, Inc.,* 150 Mich. App. 749, 755 n.1 (1986).  Thus,

contrary to Plaintiff's assertion, neither *Atkinson* nor *Broadus* sustains an IIED claim based

merely upon the fraudulent denial of workers' compensation benefits.

Moreover, in *Hajciar v. Crawford & Co.,* the Michigan Court of Appeals even held that a

claim that the defendant terminated the plaintiff's workers' compensation benefits to coerce the

plaintiff into accepting a lump-sum payment that he had previously refused failed to state the

requisite "extreme and outrageous" conduct and, thus, failed to state an IIED claim.  142 Mich.

App. 632, 634, 639 (1985).  In *Lisecki v. Taco Bell Restaurants, Inc.,* the Court of Appeals held

that "[t]he facts in *Hajciar* were essentially identical to those presented here, i.e., an allegation

by the plaintiff that . . . [the defendant] wrongfully terminated [his compensation benefits] . . . to

further some ulterior motive of the defendants rather than due to the plaintiff's" non-entitlement

to those benefits.  150 Mich. App. at 755 (holding so where the plaintiff alleged that the

defendant had colluded to claim falsely that the plaintiff's physician had informed the claims

adjuster that the plaintiff had been released to work and where the plaintiff was later discharged

from employment and denied workers' compensation benefits).  According to the Court, "such

conduct simply cannot be characterized as outrageous and atrocious."  *Id.* (noting that the

49

plaintiff had an adequate remedy for the termination of benefits with his WDCB claim).

In *Hailes v. Liberty Mutual Insurance Company,* the Michigan Court of Appeals suggested that "facts evidencing a continuous pattern of harassment, abuse, and unethical conduct" may constitute the requisite "extreme and outrageous conduct" for purposes of stating an IIED claim.  No. 215509, 1999 WL 33326762 (Mich. Ct. App. Dec. 28, 1999) (relying upon *Atkinson*, 171 Mich. App. at 791).  Plaintiff's complaint asserts that the corporate Defendants engaged in a "continuous pattern of harassment, abuse, and unethical conduct."  (1st Am. Compl. at ¶ 17; Resp. to Harrison at 16.)  In support, Plaintiff's complaint simply alleges that Defendants entered into a voluntary agreement to pay Plaintiff's workers' compensation benefits and, soon thereafter, retained Ray to provide a false cut-off report by which Defendants could fraudulently deny Plaintiff's benefits.  (*Id.*)  However, Plaintiff's complaint, even when construed in Plaintiff's favor, fails to allege factual allegations rising to the level of the harassment, abuse, and unethical conduct that the Michigan Court of Appeals found actionable in *Atkinson.  See* 171 Mich. App. at 790-91.  Thus, Plaintiff's IIED claims fail to state claims for which relief may be granted under Rule 12(b)(6).[22]

### III. SUMMARY

For the preceding reasons, the Court:

1)      DISMISSES Plaintiff's RICO claims because they fail to state claims for which relief may be granted, and because the WDCA reverse-preempts those claims under the McCarran-Ferguson Act; and

---

[22]In its motion to dismiss, Harrison maintains that § 301 of the LMRA preempts Plaintiff's IIED claims for the same reasons that § 301 preempts Plaintiff's RICO claims.  (Harrison Br. at 17-18.)  Because Plaintiff's IIED claims fail to state claims for which relief may be granted under Michigan law, the Court need not and does not reach this issue.

2)      DISMISSES Plaintiff's state-law claims of intentional infliction of emotional distress against Defendants for failure to state claims for which relief may be granted.

s/Paul D. Borman
PAUL D. BORMAN
UNITED STATES DISTRICT JUDGE

Dated:  May 17, 2005

## CERTIFICATE OF SERVICE

Copies of this Order were served on the attorneys of record by electronic means or U.S. Mail on May 17, 2005.

s/Jonie Parker
Case Manager

51